## Goodpaster, Treasurer v. United States Mortgage Bond Company.

### (Decided February 27, 1917.)

### Appeal from Bourbon Circuit Court.

1. Statutes—Construction—Intention.—A statute is to be construed so as to effectuate the intention of the legislature in enacting it, as gathered from the context and the subject matter. If, therefore, it becomes necessary to carry out this intention to disregard some words or to transpose sentences, it is the duty of the court to do so.

2. Statutes—Construction.—If a statute is subject to two constructions, one of which would be legal and the other illegal, and one of which would be just and equitable and the other unjust and inequitable, it is the duty of the court in construing it to adopt that construction which would be legal, just and equitable.

3. Statutes—Construction.—Applying these rules, section 2223b of the Kentucky Statutes relating to investment companies is construed so as to require such companies authorized after the passage of the act as a condition precedent to beginning business, to deposit with the state treasurer the total amount of its paid-up capital stock, provided it be equal to $15,000.00, and if not equal to that sum to supply the deficiency either in cash or in other securities enumerated in the statute.

M. M. LOGAN, Attorney General, and CHARLES H. MORRIS, Assistant Attorney General, for appellant.

GIBSON & CRAWFORD for appellee.

OPINION OF THE COURT BY JUDGE THOMAS—Reversing.

This appeal imposes upon us the duty of construing section 2223b of the Kentucky Statutes passed by the legislature in 1902. The parts of the section more directly involved are found in subsections 1 and 8 of the section under consideration. The question arises in this way: The appellee (plaintiff), prior to September 2, 1916, was duly and regularly incorporated, having complied with all of the provisions of the law to effect its corporation, and on that day it amended its charter in compliance with the law, after which it applied to the appellant (defendant) as Treasurer of the Commonwealth for a license to do business as an investment company, which, under the provisions of the section of the statute, *supra,* it is required to obtain before it can engage in such business. In view of the fact that plaintiff by making the application, thereby concedes that it intends to operate as an investment company such as the statute regulates, we will not investigate or determine that question, but will treat it as settled, for the purposes of this opinion, by plaintiff's action in this regard. Besides, when we look to the articles of incorporation, we find that plaintiff is therein authorized to do almost anything from the manufacturing of a pin to the moving of a mountain, which we think would include the conducting of the business to regulate which the statute was enacted.

At the time plaintiff applied to the defendant for the license, provided by the statute as a condition precedent to its doing business as an investment company, it presented to him a certified copy of its articles of incorporation and amendment thereto, together with a verified statement of its president, secretary and treasurer, showing its assets and liabilities, and that it had no funds except what were derived from the sale of its capital stock; that it had not theretofore done any business except to solicit subscriptions for stock and to purchase some real estate in Jefferson county; that its capital stock was $50,000.00, $25,197.50 of which (more than one-half) had been paid, and all of it invested in the real estate mentioned, which constituted plaintiff's entire assets. At the same time it tendered to defendant a check for $100.00, being the fee for issuing the license. Defendant declined to grant the request to issue the license, whereupon and under protest plaintiff executed

a deed to defendant, conveying to him an absolute title to its real estate, to be held by him as a deposit for the purpose contemplated by the statute, which deed defendant declined to accept and again refused to issue the license, and this suit was subsequently filed to obtain a mandatory order from the court requiring and directing him to do so.

The petition alleged the recited facts and a demurrer filed to it was overruled, following which order an answer was filed, to which a demurrer was sustained, and defendant declining to plead further, the trial court. granted the relief and directed the defendant to issue the license. To review that judgment the defendant brings the case here.

From what has been said it is easy to see that the plaintiff makes two contentions, they being: (1) that under the language employed in subdivision 1 of the statute, it being a beginning company, is not required to place with the treasurer any deposit at all; and, (2) that if it should be mistaken in this, under the provisions of subsection 8 of the section it may invest its entire. capital, as well as surplus, in real estate, and that the execution of the deed to the treasurer fully complied with subsection 1, and that the court properly required him to issue the license.

The contention of the defendant is that, under the provisions of subsection 1 of the section, the defendant must deposit with him, as a condition precedent to obtaining the license, a fund equal to the total amount of its paid-up capital stock, provided same be as much as $15,000.00, but if not that amount, the paid-up capital stock to be supplemented by an additional amount sufficient to make it $15,000.00. He further contends that the statute nowhere authorizes him to accept as the required deposit a deed to real estate, and because of these two contentions he insists that the court erred in requiring him to issue the license. Subsection 1 involved, in so far as relevant to the question presented, is as follows:

"Every corporation of the character generally known as investment companies, organized, or which may be hereafter organized under the laws of Kentucky, for the purpose of conducting the business of placing or selling certificates, bonds, debentures, certificates of interest, or other investment securities of any kind, on the par-

tial payment, installment or any other plan of payment, and providing for the redemption and retirement of same, or any part thereof, and every company, partnership, or association conducting such business in this state shall provide a reserve and redemption fund of not less than seventy-five per cent. of amount collected in premiums, for the benefit and protection of its investors, and so much of said fund as shall not be immediately distributed to investors shall be invested as hereinafter provided, and every such company, corporation, partnership, association or individual now doing such business in this state within ninety days after the passage of this act, shall deposit with the State Treasurer the total amount of its paid-up capital stock, and if said paid-up capital stock shall not amount to fifteen thousand dollars, shall deposit in addition thereto enough of the reserve fund to make fifteen thousand dollars in cash.''

Subsection 8 prescribes the property in which the reserve fund as well as the capital stock of such corporations may be invested, saying:

''The reserve fund, capital stock, and any increase thereof, of each and every such incorporation, company, partnership or association, doing business in this Commonwealth, shall be invested in such real estate as may be necessary for the proper conduct of business; the bonds or mortgages, lien notes or deeds of trust on unincorporated real estate, worth fifty per centum per annum more than the sum loaned thereon, exclusive of buildings,'' &c.

In brief, the insistence of the plaintiff is that the very language of subsection 1 requires investment companies to ''provide a reserve and redemption fund of not less than seventy-five per cent. of amount collected in premiums;'' that such reserve or redemption fund as provided by the collection of premiums shall be invested in certain securities enumerated in the statute, none of which can be done by a beginning company, as it has done no business and has, therefore, collected no premiums. It is further insisted that no such beginning company is called upon to make a deposit of any of its capital stock because the provision of the statute requiring such deposit applies only to investment companies ''now (at the time of the passage of the act) doing such business in this state,'' and that companies of the latter class only should make such deposit (paid-up capital

stock) and within ninety days after the passage of the act.

As to the provisions of subsection 8, plaintiff insists that it has a right thereunder to invest all of its assets in real estate, and having such right it may deposit with the treasurer a deed to such property, thereby fully complying with the terms of the statute.

Considering now the contention of plaintiff as to the meaning of subsection 1, it must be admitted that there is considerable room for the position taken, if we look alone to the phraseology of the statute and disregard fundamental rules for the interpretation of statutes as well as ignoring the fact that at the very beginning of the enactment both past and *future* organized investment companies are proposed to be dealt with. Undoubtedly, in the investigation of the meaning of a statute resort must be had first to its words, and when clear they are decisive. This rule, however, is not easy of application, for sometimes the meaning of the words of a statute may be clear, but the objects to which they are addressed may be uncertain, in which cases the courts are called upon when interpreting the statute to solve the uncertainty. This is done through the application of other rules of ancient origin and frequent use. Some of these rules are that a statute shall be so construed as to effect the plain and manifest purpose and intention of the legislature in enacting it. Another is that the statute should be so construed as to render it constitutional instead of unconstitutional, and to make its application equitable and just instead of inequitable and unjust.

In support of what has just been said, Cyc., volume 36, page 1102, says:

"By the construction of a statute is meant the process of ascertaining its true meaning and application. For this purpose resort may be had not only to the language and arrangement of the statute, but also to the intention of the legislature, the object to be secured, and to such extrinsic matters as the circumstances attending its passage, the sense in which it was understood by contemporaries, and its relation to other laws."

In the same volume, page 1115, it is said:

"But in obedience to the cardinal rule of ascertaining the intention of the legislature, if more than one significance may reasonably be attached to the language

used, or a literal construction will make the act absurd, or will lead to injustice, the court may properly resort to construction." See, also, Sutherland on Statutory Construction, volume 2, sections 384, 489 and 498, from which we will not encumber this opinion with quotations.

These general rules have received the sanction of this court in many cases, some of which are: Grinstead v. Kirby, 33 Ky. Law Rep. 287; James v. United States Fidelity & Guaranty Co., 133 Ky. 299; Commonwealth v. Ledman, 127 Ky. 603; Commonwealth v. International Harvester Co., 131 Ky. 551, and Stanley v. Townsend, 170 Ky. 833.

The authority given to courts in construing statutes under these rules permits them, if necessary to carry out the intention of the legislature, to "correct evident mistakes, supply accidental omissions, remedy the improper use of words, modify their ordinary meaning, and even alter the structure of sentences." 26 Am. & Eng. Ency. of Law, 2nd edition, 653; Riggs v. Palmer, 12 Amer. St. Rep. 819; State v. Chicago, Etc. R. R. Co., 38 Minn. 281; Young v. Regents of University, 87 Kan. 239; Ann. Cas. 1913 D. 701; James v. U. S. Fidelity & Guaranty Co., 133 Ky. 299; Commonwealth v. International Harvester Co., 131 Ky. 551.

In recognizing the rule, this court in the James case said:

"Where the words used are plain, clear and unambiguous, and the language of the act expresses the legislative intent, there is no room for construction, and the act must be accepted and enforced as it is written. Cases frequently arise, however, where, from the wording of the act, or the arrangement of the words or phrases therein, or the use of some particular word or words in the act, the legislative intent is not clearly expressed, if expressed at all, and in such cases it becomes necessary to construe the act so as to make it, where this may be done, express the true legislative intent. As said by Sutherland in his work on statutory construction, the intent is the law; the statute is but expressive of that intent."

Further along in the opinion in elaborating the rule, the opinion uses this language:

"The object sought to be attained by the enactment of this statute being clearly ascertained, it furnishes a most excellent aid in determining whether or not the

words used convey the meaning which the legislature intended they should.   Where they do not, and from the context, the attendant circumstances, and the object sought to be accomplished this fact is made to appear then the words may be modified, altered or supplied so as to keep the act from being inconsistent with the legislative intent.   In dealing with this subject, Mr. Endlich, in his work on Interpretation of Statutes (page 400, section 295), says: 'Where the language of a statute, in its ordinary meaning and grammatical construction, leads to a manifest contradiction of the apparent purpose of the enactment, or to some inconvenience or absurdity, hardship or injustice presumably not intended, a construction may be put upon it which modifies the meaning of the words and even the structure of the sentence.   This is done sometimes by giving an unusual meaning to particular words, sometimes by altering their collocation, or by rejecting them altogether, or by interpolating other words, under the influence, no doubt, of an irresistible conviction that the legislature could not possibly have intended what its words signify, and that the modifications thus made are mere corrections of careless language, and really give true intention.' ''

With these rules for our guide, let us turn to subsection 1 of the statute under consideration in order to ascertain the meaning of the legislature in its enactment.   Not only the manifest purpose, but the expressed purpose of the legislature in requiring a deposit to be made with the State Treasurer by investment companies was, as stated in the statute, "for the benefit and protection of its investors," and, as stated further along in the same subsection, "said funds so deposited shall be for the protection of investors in such certificates, debentures and other investment securities wherever residing."

Plainly the legislature conceived the idea, as a reason for the passage of the act, that the investors in the securities of such companies were in danger of losing their investments and needed such protection as the legislature sought to supply by the passage of the law. This necessity would exist for the benefit and protection of investors in future incorporated investment companies the same as in past incorporated investment companies.   There cannot be any possible reason why the legislature should seek to protect investors in one class of

companies and not in the other. They were equally exposed to the same danger. Moreover, that the legislature intended for its act to apply to both past and future organized investment companies is made manifest from the very terms of the statute when it purports to include "investment companies, organized, or which may be *hereafter* organized under the laws of Kentucky."

Further along it is provided that such companies, including both past and future organized ones, "shall provide a reserve or redemption fund." It is true that sentence continues by fixing the amount of such reserve fund as to companies "now doing business in this state," which reserve fund, as to such companies, should not be less than seventy-five per cent. of the amount of premiums which they had collected. The legislature further contemplated that it might be possible that such investment companies as were organized and doing business at the time of the passage of the act might not have on hand a fund from the collection of premiums, either because such fund may have been distributed among the investors, if collected, or the company might have done no business up to the time of the passage of the act, and in such case those companies theretofore organized would be in the same condition as a company thereafter organized with reference to a reserve or redemption fund; i. e., it would have no such fund, but the legislature did not intend that because of this fact the protection of its investors which the act intended to accomplish should not be required, because in that event the company is required by the act to deposit with the State Treasurer "the total amount of its paid-up capital stock," &c., which is in lieu of the reserve fund provided through the collection of premiusm.

Giving the statute this construction does no serious harm to its wording, as the clause therein, "and. every such company, corporation, partnership, association or individual now doing business in this state, within ninety days after the passage of this act, shall deposit with the State Treasurer," &c., provides only the *time* within which investment companies *then* existing might comply with the terms of the statute and obtain a license to continue to conduct its business.

Such pre-existing companies without a reserve fund were required, nevertheless, to make the protecting deposit, showing that the dominant purpose was to pro-

tect the investors by requiring the deposit to be made, which requirement is obligatory whether the company has, or has not, a reserve fund. If the company was a pre-existing one with no reserve from collected premiums, it would stand exactly in the same condition as a beginning company organized in the future, and both should be required, in that event, to comply with the statute by depositing its paid-up capital stock. This construction is made necessary in order to protect the statute from the charge of being absurd, and to give it a uniform application.

Moreover, to construe the statute as contended for by plaintiff would be unjust, inequitable and discriminatory, in that it would require some corporations of the same class (investment companies) to make deposits with the treasurer and excuse others from doing so, while both of them were conducting the same character of business and in which their respective investors would be subjected to the same danger and entitled to the same protection afforded by the deposit. It is doubtful if the statute as so interpreted would be constitutional, but whether so or not the construction would plainly contravene the intention of the legislature and cannot be adopted. Our conclusion, therefore, is that a newly organized and beginning investment company is required by the statute to deposit with the State Treasurer a fund to be provided by it equal to the amount of its paid-up capital stock if that sum is as much as $15,000.00. In the instant case the paid-up capital stock is $25,197.50, which plaintiff should deposit with the treasurer before it can legally demand of him a license to do business as an investment company. This sum need not be in cash, but may consist of such securities as are enumerated in the statute, the dividends or income from which may be collected and used by the plaintiff under the provisions of subsection 4 of the statute.

This being true, was the execution of the deed by plaintiff to the defendant for the real estate in which it has invested its paid-up capital stock sufficient? Our answer is, we think not. In the long enumerated list of securities which the treasurer may accept in taking the deposit a deed to real estate executed to himself is nowhere mentioned. Conceding, therefore, that subsection 8 of the section under consideration permits the

plaintiff as an investment company to invest all of its capital stock or reserve fund, or both, in real estate, this fact in no wise aids its contention that the treasurer should be required to accept its deed. If its assets are so invested, there are many ways which might be suggested by which it could issue or procure some one or more of the classes of securities enumerated in the stature with which to make the deposit. To uphold its contention we would not only be compelled to add to the list of the securities mentioned in the statute which the· treasurer may accept, but would furthermore be called upon to determine that such companies, under the provisions of subsection 8, have the authority to invest all of their assets in real estate, regardless of the fact-that such real estate might be in excess of that which "may be necessary for the proper conduct of business," which is doubtful, but not necessary to be now determined.

Moreover, to require the treasurer to accept the deed to real estate would produce consequences and troublesome situations never contemplated by the statute. The treasurer would be required, if such were the law, to investigate the title to the real estate, and would be burdened with the responsibility of doing this. Upon every occasion of the sale of some of the real estate, or of the placing of a lien upon it, he would be annoyed with these matters, and we are thoroughly convinced that there is nothing in the statute permitting the corporation to comply with the statute by the execution of a deed to the treasurer, or the latter to comply with it by accepting any such deed.

It follows, therefore, that the court erred in granting the writ prayed for, and the judgment is reversed with directions to dismiss the petition, and for proceedings consistent with this opinion. The whole court sitting.