Robert L. HELERINGER, Appellant,

v.

John Y. BROWN III in His Official Capacities as Secretary of State of the Commonwealth of Kentucky and Chairman of the State Board of Elections of the Commonwealth of Kentucky; State Board of Elections, Commonwealth of Kentucky; Kentucky Registry of Election Finance; Ernie Fletcher; and Friends of Ernie Fletcher, Appellees.

No. 2003–SC–0327–TG.

Supreme Court of Kentucky.

May 7, 2003.

Samuel Manly, Law Offices of Samuel Manly, Michael G. Karem, C. Thomas Hectus, Randall S. Strause, Hectus & Strause PLLC, L.J. Hollenbach III, Hollenbach & Associates, Louisville, Counsel for Appellant, Robert L. Heleringer.

A.B. Chandler III, Attorney General of Kentucky, Scott White, Assistant Attorney General, Frankfort, Counsel for Appellees, John Y. Brown III and State Board of Elections, Commonwealth of Kentucky.

Rosemary Center, Jennifer B. Hans, Kentucky Registry of Election Finance, Frankfort, Counsel for Appellee, Kentucky Registry of Election Finance.

Bradford L. Cowgill, Garland Hale Barr IV, Stites & Harbison, PLLC, Lexington, Counsel for Appellee, Ernie Fletcher.

James E. Milliman, Jason P. Underwood, Middleton & Reutlinger, Louisville, Counsel for Appellee, Friends of Ernie Fletcher.

Opinion and Order of the Court by Chief Justice LAMBERT.

This cause comes before the Court on

transfer from the Court of Appeals.[1] Transfer was granted on April 30, 2003, and we heard oral argument on May 1. The urgency of this matter is manifest as the primary election of the Republican nominees for Governor and Lieutenant Governor will occur on May 20, 2003. Despite an abbreviated schedule, the parties have presented persuasive briefs and arguments, and the Court has appropriately considered the case.

This is a close case on the law and Heleringer has presented legal issues worthy of this Court's time and attention. The facts and pre-trial proceedings are not in material dispute. On December 3, 2002, Ernie Fletcher and Hunter Bates filed a notification and declaration to form a slate for Governor and Lieutenant Governor subject to the May 20, 2003, Republican primary. As part of that process, both stated under oath that "we will not knowingly violate any election law or any law relating to corrupt and fraudulent practice in campaigns or elections in this state, and if finally elected we will qualify for our offices." On December 23, 2002, Secretary of State John Y. Brown, III, certified the candidacy of the Fletcher–Bates slate. The filing deadline of January 28, 2003, as set forth in KRS 118.165, passed without any change in the Fletcher–Bates slate.

On March 11, 2003, an action was brought against Bates in the Oldham Circuit Court seeking a declaration under KRS 118.176 that Bates was not a *bona fide* candidate for Lieutenant Governor for failure to meet the six year residency requirement of Section 72 of the Kentucky Constitution. On March 26, 2003, the Oldham Circuit Court held:

G. Hunter Bates is not a *bona fide* candidate for the office of Lieutenant Governor of Kentucky. The name of G.

Hunter Bates shall be stricken from the written designation of the election officers filed with the Kentucky Board of Elections. This Order shall be certified to the Kentucky Board of Elections.

No appeal was taken from that decision.

On March 28, 2003, a new action was brought by Robert L. Heleringer, a registered voter and Republican candidate for Lieutenant Governor of Kentucky, against Fletcher, the Secretary of State, the Registry of Election Finance, and the State Board of Elections seeking to prevent Fletcher from naming a substitute for Bates, and to remove Fletcher's name from the ballot. Thereafter, on April 1, 2003, the Franklin Circuit Court held that under KRS 121A.080(11):

Fletcher is allowed to designate a new name since Hunter Bates is disqualified as a Candidate for Lieutenant Governor on the Fletcher Slate by Order of the Oldham Circuit Court entered March 26, 2003. We interpret the order of the Oldham Circuit Court to be a disqualification invoking the privileges of [KRS] 121A.080(11).

Under date of March 31, 2003, the Secretary of State issued a memorandum to Fletcher stating, in part, that:

Pursuant to KRS 121A.080(11), I hereby certify that a vacancy exists in the "Ernie Fletcher–Hunter Bates" gubernatorial slate that is seeking the Republican Party nomination in the May 20, 2003, primary election. This vacancy has arisen due to the March 26, 2003, Order of the Oldham Circuit Court, Division II, in 03–CI–153, disqualifying Mr. Hunter Bates for failing to meet the candidacy requirements of Section 72 of the Kentucky Constitution.

On April 7, 2003, Fletcher filed forms naming a replacement for Bates. After

---

**1.** CR 75.02.

subsequent litigation in the Franklin Circuit Court and the Kentucky Court of Appeals, Heleringer filed a motion on April 16, 2003, challenging the *bona fides* of Fletcher under KRS 118.176, and on April 18, 2003, the Franklin Circuit Court held that Fletcher was a *bona fide* candidate and was entitled to designate a new running mate under the provisions of KRS 121A.080(11).

The overarching issue in this case is whether the final judgment of the Oldham Circuit Court that "G. Hunter Bates is not a *bona fide* candidate for the office of Lieutenant Governor of Kentucky" on the slate with Ernie Fletcher likewise disqualifies Fletcher's candidacy for Governor. At the outset, we will not review the judgment of the Oldham Circuit Court rendered on March 26, 2003, whereby Bates was determined not to be a *bona fide* candidate.[2] That judgment was rendered, was not appealed, and is now final; and whether Fletcher is entitled to replace Bates as his running mate may be affected by Bates' lack of *bona fides* as a candidate. In our view, the controlling issue is whether Bates was disqualified within the meaning of KRS 121A.080(11) and can be replaced, or whether the Fletcher–Bates slate was so fundamentally flawed as to render it a legal nullity.

A persuasive argument in support of Heleringer's contention that Fletcher should be denied a right to name a replacement running mate, thereby invalidating his candidacy,[3] is that Section 70 of the Constitution of Kentucky, KRS 118.127, and KRS 118.125(2)(b) envision a unity of the slate whereby if one is found to lack *bona fides* as a candidate, the other cannot obtain a replacement. According to this contention, Bates was never qualified because he lacked the Kentucky Constitution § 72 residency and therefore, he could not be disqualified within the meaning of KRS 121A.080(11). As such, a Fletcher–Bates slate never had a *bona fide* existence.

Under this view, a slate of candidates is analogous to marriage partners and business partners, and the language of the Kentucky Constitution § 70, "elected jointly", and various statutes tend to support the idea that a flawed union is no union, and that one candidate is liable for the acts or omissions of the other. The analogy is weakened, however, upon recognition that KRS 121A.080(11) expressly provides for replacement in the event of "death, disqualification to hold the office sought, or severe disabling condition which arose after the slate formed a campaign committee...." The concept of a joint candidacy is further weakened by the general acknowledgement that a candidate could bring about his or her own "disqualification" under the statute by changing political parties, abandoning Kentucky citizenship or residency, or being convicted of a felony. Thus, while the language of the Constitution and statutes support the idea of a unitary candidacy, recognized circumstances allow a contrary result. Nevertheless, we do not lightly dismiss Heleringer's contention that Bates was never qualified and that as such, a qualified slate was not formed prior to the January 28, 2003, filing deadline.

The parties have debated the meaning of the term "disqualification" as it is used in the statute. Heleringer maintains that the Oldham Circuit Court judgment holding Bates not a *bona fide* candidate based on

---

2. *Mobley v. Armstrong,* Ky., 978 S.W.2d 307, 310 (1998).

3. "No candidate for Governor or Lieutenant Governor shall appear individually on the ballot for the nomination he is seeking." KRS 118.127.

lack of Kentucky residency left Fletcher unable to utilize KRS 121A.080(11). Under this argument, one who was "unqualified" could never suffer "disqualification." Fletcher maintains, however, that any slate complying with KRS 118.125 is a presumptively qualified slate and so remains until a member is disqualified; and if the disqualification occurs after the campaign committee was formed, there is no question that the vacancy can be filled. The case thus turns on the meaning of "disqualification."

We are required by KRS 446.080(4) to construe words and phrases "according to the common and approved usage of language." One of this Court's most persuasive decisions on statutory construction is *Gateway Construction Company v. Wallbaum*[4] in which the rule was stated as follows:

> The best way in most cases to ascertain such intent or to determine the meaning of a statute is to look to the language used, but no intention must be read into the statute not justified by the language. *Bohannon v. City of Louisville*, 193 Ky. 276, 235 S.W. 750. The primary rule is to ascertain the intention from the words employed in enacting the statute and not to guess what the Legislature may have intended but did not express. *Lewis v. Creasey Corporation*, 198 Ky. 409, 248 S.W. 1046. Resort must be had first to the words, which are decisive if they are clear. *City of Covington v. Cincinnati C. & R. Ry. Co.*, 144 Ky. 646, 139 S.W. 854; *Goodpaster v. United States Mortgage Bond Co.*, 174 Ky. 284, 192 S.W. 35; *Western Kentucky Coal Company v. Nall & Bailey*, 228 Ky. 76, 14 S.W.2d 400; *City of Covington v. Sohio Petroleum Company*, Ky., 279 S.W.2d 746. The words of the statute are to be given their usual, ordinary, and everyday meaning. *Louisville Country Club, Inc. v. Gray*, D.C., 178 F.Supp. 915; *Thompson v. Bracken County*, Ky., 294 S.W.2d 943.[5]

"Disqualification" is defined [6] as "1. Something that makes one ineligible; esp., a bias or conflict of interest that prevents a judge or juror from impartially hearing a case, or that prevents a lawyer from representing a party.... 2. The act of making ineligible; the fact or condition of being ineligible." Another definition [7] of "disqualification" is "1. The act of disqualifying or the condition of being disqualified. 2. Something that disqualifies." Under these definitions, and the "usual, ordinary, and everyday meaning," it appears that disqualification can be a prevailing condition or circumstance or it can be a discrete act or event, depending on the context in which the term is used.[8] By virtue of the statute and our decisions with respect to statutory construction, and by virtue of the definitions quoted hereinabove, we have no doubt that a judicial decision declaring a candidate not *bona fide* may be embraced in the meaning of "disqualification" where that term appears in a statute.

Despite our view that disqualification may result from a judicial act or may be a condition, there remains a question

---

4. Ky., 356 S.W.2d 247 (1962).

5. *Id.* at 249.

6. Black's Law Dictionary, 485 (7th ed. 1999).

7. The American Heritage Dictionary, 408 (2nd College ed. 1985).

8. *See, e.g., In re Mary Maguire*, 57 Cal. 604, 605–06 (Cal.1881) (*stating* "It becomes, then, necessary to inquire in what sense the word *"disqualified"*, is used in this section. It is presumed to be used in its natural and ordinary sense, unless there is something in the instrument which shows to the contrary.") (emphasis in original).

whether the Fletcher–Bates slate ever came into existence due to Bates' lack of Kentucky residence. Under KRS 118.125, a slate of candidates must file notification and declaration papers with the Secretary of State. Upon filing, the Secretary of State "shall examine the notification and declaration form of each candidate to determine whether it is regular on its face." [9] Thereafter, when the order of appearance on the ballot has been determined, the Secretary of State must certify to county clerks the name, place of residence, and party affiliation of "each candidate or slate of candidates for each office. . . ." [10] From the foregoing, we conclude that Fletcher and Bates formed a slate upon certification by the Secretary of State. The Fletcher–Bates slate thus acquired a legal existence, albeit flawed, that continued until Bates was held not to be a *bona fide* candidate by the Oldham Circuit Court. Even then, however, Fletcher was not entitled to name a replacement for Bates. That entitlement accrued only upon certification by the Secretary of State that a vacancy existed because one of the three circumstances in KRS 121A.080(11) had been met. The Secretary of State so certified on March 31, 2003, and Fletcher named his new running mate a few days later.

A question has been presented and the Court has carefully considered the proper grammatical construction of the controlling provision. As it appears in KRS 121A.080(11), the statute states

If a vacancy occurs in a slate of candidates after the ballots are printed for the primary election, the remaining member of the slate may designate a replacement for the vacant candidate or change the composition of the slate and designate a running mate on forms filed with the registry prior to the primary election, but only following certification to the remaining candidate by the Secretary of State that a vacancy exists for a reason specified in this subsection. If a replacement for a vacant candidate is made after the ballots are printed for the primary election *because of death, disqualification to hold the office sought, or severe disabling condition which arose after the slate formed a campaign committee,* notices informing the voters of the change in the composition of the slate shall be posted at each precinct polling place.[11]

■ Does the phrase "which arose after the slate formed a campaign committee" relate to each of the three identified circumstances or only to the last, "severe disabling condition"? It is an accepted rule of grammar that when a qualifying phrase follows two or more contingencies separated by commas, the qualifying phrase applies only to the immediately preceding contingency unless the qualifying phrase is itself preceded by a comma.[12] There is no comma between the words "condition" and "which" and the rule of grammar just stated imposes no time restriction on the occurrence of "death" or

---

9. KRS 118.165(2).

10. KRS 118.215(1).

11. KRS 121A.080(11) (emphasis added).

12. *See Smith v. Commonwealth,* Ky.App., 41 S.W.3d 458, 459–60 (2001) (*holding* "Each of the three prohibited behaviors is set off by commas; the conjunction *or* precedes the last offense. Thus, the activities are disjunctive and separate from one another. Further-

more, the participial phrase at the very end of the definition, "constituting a felony," is not preceded by a comma—a grammatical fact that renders it restrictive in nature modifying only the noun (*i.e.,* the criminal activity) immediately preceding it—vastly enlarging the scope of forbidden criminal activity to encompass far more than the marijuana use or gambling enterprises discussed above.").

"disqualification to hold the office sought." For a severe disabling condition to authorize replacement, the condition would have to arise after the slate formed a campaign committee, but no such restriction appears with respect to "death" or "disqualification to hold the office sought."

Upon the issues discussed hereinabove, by virtue of the initial certification of the Fletcher–Bates slate and the subsequent certification by the Secretary of State of the vacancy, Fletcher was entitled to name a replacement running mate pursuant to KRS 121A.080(11).

Heleringer also contends that KRS 121A.080(11) violates Kentucky Constitution § 51 and is unconstitutional. If we accept this view, the "replacement" statute that Fletcher seeks to utilize would not exist and he would be without any basis upon which to replace Bates. The Franklin Circuit Court held that Heleringer's Section 51 claim was without merit and we agree.

Kentucky Constitution § 51 provides:

> No law enacted by the General Assembly shall relate to more than one subject, and that shall be expressed in the title, and no law shall be revised, amended, or the provisions thereof extended or conferred by reference to its title only, but so much thereof as is revised, amended, extended or conferred, shall be reenacted and published at length.

When the text of KRS 121A.080(11) was enacted in 1992, the title of the act was "An ACT relating to the regulation of the conduct and financing of elections." The provisions of subsection (11) were not amended by subsequent enactments, and it thus appears that the question of whether it violates Kentucky Constitution § 51 stands or falls on the title of the 1992 Act.[13] This text appears to have been germane to the 1992 Act, and it is not rendered unconstitutional merely because this provision of 1992 Ky.Acts chapter 288, § 8, was placed in KRS 121A instead of KRS 118. Moreover, we do not believe that an Act dealing with both the conduct and financing of elections violates the Section 51 prohibition against multiple subjects. We have held:

> If the subdivision or section is germane to the general subject, it should be held to be included in the general. It is not ordinarily objectionable that the title of the Act does not embrace or dispose of everything to which it relates, providing it is not entirely misleading and is fairly, reasonably and logically related to the scope and purpose of the Act.[14]

Since the "conduct" of elections and the "financing" of elections do not appear to be "dissimilar and discordant subjects,"[15] the plurality prohibition of Section 51 is not violated by 1992 Ky.Acts chapter 288.

Finally, Fletcher urges this Court to liberally construe the statutes here under review "in favor of citizens whose right to vote they tend to restrict."[16] The idea of liberal construction in favor of broad voter participation is deeply embedded in Kentucky law. When statutory construction is uncertain, doubt should be resolved in favor of allowing the candidacy to continue. In *Napier v. Roberts*,[17] a defeated primary election candidate ran in the gen-

**13.** *See* KRS 446.145.

**14.** *Miller v. Commonwealth ex rel. Harrodsburg,* 300 Ky. 215, 187 S.W.2d 837, 838 (1945).

**15.** *Id.*

**16.** *Greene v. Slusher,* 300 Ky. 715, 190 S.W.2d 29, 32 (1945).

**17.** 172 Ky. 227, 189 S.W. 206 (1916).

eral election as an independent. In response to the challenge, this Court said,

> In conclusion it may be said that while it is the policy of the law to uphold and guarantee, as much as possible, fairness, honesty and purity in elections, it may be also considered a rule of equal public importance that the individual voter should not be deprived of the opportunity of choosing a public servant from among those who may seek the place, unless the plain or manifest purpose of the law demands it.[18]

*Napier* was followed in *Greene v. Slusher* [19] in support of the right of one to seek elective office under the "Law and Order Party" notwithstanding that no such party existed. A similar view appears in *Queenan v. Mimms,*[20] and in *Baker v. Marcum* [21], we said:

> From the nature of things the interpretation of election laws, designed by secret ballot to register the public will, must be along sound and reasonable lines, and not so ultra technical as either to defeat the will of the public or to place an unnecessary burden upon the electors.

■ These long-standing principles require this Court to resolve any doubt in favor of allowing the Fletcher candidacy to continue to prevent restriction of the rights of citizens to vote.

IT IS HEREBY ORDERED that Heleringer's motion under KRS 118.176(4) to set aside the final judgment be and is hereby denied. The decision of the Franklin Circuit Court is affirmed.

JOHNSTONE, KELLER, STUMBO, and WINTERSHEIMER, JJ., concur.

STUMBO, J., files a separate concurring opinion in which JOHNSTONE, J., joins.

WINTERSHEIMER, J., also files a separate concurring opinion.

COOPER, J., concurs in result only and files a separate concurring opinion in which GRAVES, J., joins.

STUMBO, Justice, concurring.

I concur fully with the opinion by Chief Justice Lambert but write separately to emphasize the point that to grant Appellant the relief he seeks would result in the disenfranchisement of those who would have voted for the Fletcher slate.

In *Bullock v. Carter,* 405 U.S. 134, 92 S.Ct. 849, 31 L.Ed.2d 92 (1972), the United States Supreme Court struck down a candidate filing fee system due to the barriers it created to assess to the primary ballot. The Court therein stated:

> In approaching candidate restrictions, it is essential to examine in a realistic light the extent and nature of their impact on voters. . . .
>
> [T]he rights of voters and the rights of candidates do not lend themselves to neat separation; laws that affect candidates always had at least some theoretical, correlative effect on voters.

*Bullock, supra* at 143–144, 92 S.Ct. 849.

Realistically viewed, the situation here is this: remarkable efforts have been made to gain political support by all of the candidates in the form of money spent on advertising and other contact with voters; the ballot order has been determined and ballots printed; and, absentee ballots have already been cast and the primary election is a matter of days away. To, at

---

**18.** *Id.,* 189 S.W. at 209.

**19.** *Greene,* 190 S.W.2d at 32.

**20.** Ky., 283 S.W.2d 380 (1955).

**21.** 216 Ky. 210, 287 S.W. 696 (1926).

this point in the process, eliminate a choice from consideration in the Republican primary, would clearly have more than a theoretical effect on the voters. Their contributions, physical labor, even their absentee ballot, if already cast, would be rendered a nullity. To lose a vote because your candidate is defeated is one thing; to lose a vote because a candidacy is voided due to technical reasons is another entirely. The effect would be real and must be acknowledged, just as our predecessor court acknowledged the rights of the voters in cases in which a candidacy has been challenged. In *Queenan v. Mimms,* Ky., 283 S.W.2d 380, 382 (1955), it was noted that: "It is a fundamental principal that the courts will construe election statutes liberally in favor of the citizens whose right to choose their public officers is challenged. *Greene v. Slusher,* 300 Ky., 715, 190 S.W.2d 29 (1945)." The right of the qualified voter to cast an effective vote is among our most precious freedoms.

In holding that the disqualified member of the Republican slate may be replaced, this Court honors in practice that important principle.

JOHNSTONE, J., joins this concurring opinion.

WINTERSHEIMER, Justice, concurring.

I concur in the result announced by the majority opinion because the decision of the Franklin Circuit Judge was not clearly erroneous. It is an unquestioned fundamental rule of appellate practice that the judgment of the trier of fact should be affirmed if it is free of error. Findings of fact in support of a judgment should not be set aside unless clearly erroneous with due regard being given to the opportunity of the trial judge to consider the credibility of the witnesses. CR 52.01. Obviously, the trial judge is in the very best position to ascertain the credibility of those who testify before that judge.

Election contests or matters related to elections should be governed by the standard of review of a civil action. *Cf. Deaton v. Little,* Ky., 452 S.W.2d 384 (1969). The Supreme Court in its appellate capacity is bound by the findings of fact of the trial judge unless there is clear error or an abuse of discretion. *Cf. General Motors Corp. v. Herald,* Ky., 833 S.W.2d 804 (1992).

The crux of this case is whether candidate Fletcher conducted a sufficiently extensive investigation into the residency of his Lieutenant Governor running mate. The trial judge found that he had done so and no reversible error has been demonstrated so as to produce a contrary result.

There is no doubt that the Lieutenant Governor candidate did not satisfy the requirements of the law as to residency as initially determined by the Oldham Circuit Judge. However, that is not dispositive of the issue here. The true question is whether candidate Fletcher had a valid reason to accept the legal advice and statements of his running mate and others. That question has already been resolved by the Franklin Circuit Judge. There is no reason to overturn his decision.

I fully concur with the statements in the majority opinion which cite with approval the observation of previous cases in regard to the proper approach to election law disputes. I particularly agree with the philosophies expressed in part in *Queenan v. Mimms,* Ky., 283 S.W.2d 380 (1955); *Greene v. Slusher,* 300 Ky. 715, 190 S.W.2d 29 (1945); *Baker v. Marcum,* 216 Ky. 210, 287 S.W. 696 (1926) and *Napier v. Roberts,* 172 Ky. 227, 189 S.W. 206 (1916).

To paraphrase *Marcum, supra,* the interpretation of election laws must be along

reasonable lines and not so ultra-technical as to unnecessarily burden the voters. Every effort should be put forward so as to allow the voters in any election, primary or general, to fully and with reasonable intelligence exercise their right to vote.

COOPER, Justice, concurring.

Fletcher and Bates filed their joint candidacy papers and formed their campaign committee on December 3, 2002. On their candidacy papers, each swore that "if finally elected, *we* will *qualify* for our offices." KRS 118.125(2)(b) (emphasis added). Since they were required to run as a slate and neither could appear individually on the ballot for the office he was seeking, KRS 118.127, each effectively warranted that, if elected, both would qualify for the respective offices they were seeking. Section 72 of the Constitution of Kentucky provides in pertinent part:

> The Governor and the Lieutenant Governor shall be at least thirty years of age, and have been citizens and residents of Kentucky for at least six years next preceding their election.

Thus, in order to qualify for the office of Lieutenant Governor, Bates must have been a resident of Kentucky for at least six years next preceding November 4, 2003. As of November 5, 1997, Bates was a resident of Alexandria, Virginia, and he remained so until no earlier than February 2002 when he and his wife purchased a home in Goshen, Kentucky. *Shain v. Bates,* 03–CI–153, Oldham Circuit Court, Ky., Div. II (March 26, 2003). Thus, from and after November 5, 1997, Bates was disqualified to hold the office of Lieutenant Governor of Kentucky if elected on November 4, 2003. More specifically, he was disqualified to hold that office when he and Fletcher filed their candidacy papers and formed their campaign committee on December 3, 2002.

The word "disqualification" has two recognized definitions:

> 1. The act of disqualifying, or state of being disqualified; want of qualification; incompetency; disability; as, the disqualification of certain men from holding office.
> 2. That which disqualifies; that which incapacitates or makes unfit; as, conviction of a crime is a disqualification of a person for office; sickness is a disqualification for labor.

*Webster's Revised Unabridged Dictionary* (Micra, Inc. 1996, 1998). These definitions are lifted from Fletcher's brief which attributes significance to the order in which the definitions are listed, *i.e.,* the first listed definition is preferred and the second listed definition is only secondary. However, *Merriam–Webster's Dictionary* lists the definitions in the reverse order. *See Merriam–Webster Dictionary Online* (visited May 7, 2003) <http://www.m-w.com.html>. I conclude, as does the majority opinion, that the definitions are of equal weight depending upon the context in which they are applied.

The judgment of the Oldham Circuit Court, *supra,* did not purport to "disqualify" Bates but only declared that "Bates is not a *bona fide* candidate for the office of Lieutenant Governor of Kentucky" and ordered his name stricken from the ballot. Unlike the majority opinion, I attribute no significance to the fact that the Secretary of State initially certified the Fletcher–Bates slate. KRS 118.165(2) only requires that the Secretary of State, prior to certification, "examine the notification and declaration form of each candidate to determine whether it is *regular on its face.*" (Emphasis added.) Clearly, the notification and declaration form filed by the Fletcher–Bates slate was "regular on its face" and the Secretary of State was under no duty to go behind the form to determine the

accuracy of the information contained therein.[1] That is the duty of the appropriate circuit court upon the filing of a challenge to the "bona fides" of a candidate pursuant to KRS 118.176.

Bates's failure to appeal the judgment of the Oldham Circuit Court triggered the language in KRS 118.127 that "No candidate for Governor ... shall appear individually on the ballot for the nomination he is seeking," and the viability of Fletcher's gubernatorial candidacy thus depends upon whether he could, pursuant to KRS 121A.080(11), designate a replacement candidate to fill the vacancy created by Bates's removal from the ballot. That statute provides in pertinent part:

> If a vacancy occurs in a slate of candidates ... *because of death, disqualification to hold the office sought, or severe disabling condition which arose after the slate formed a campaign committee,* the remaining member of the slate may designate a replacement....

(Emphasis added.)

Heleringer's primary argument is that the qualifying clause, "which arose after the slate formed a campaign committee," applies to each contingency, *i.e.,* death, disqualification, or severe disabling condition. Although the majority opinion addresses this issue, it cannot, in fact, reach it because the majority concludes that Bates became qualified when the slate was certified by the Secretary of State. Thus, according to the majority, Bates did not become "disqualified" until he failed to appeal from the judgment of the Oldham

Circuit Court. While I believe Bates was disqualified before the slate ever formed a campaign committee, I reach the same conclusion as the majority's *dictum,* but not on the basis of the absence of a comma before the word "which."

> Punctuation marks are no part of an act. To determine the intent of the law, the court, in construing a statute, will disregard the punctuation, or will repunctuate, if that be necessary, in order to arrive at the natural meaning of the words employed.

*United States v. Shreveport Grain & Elevator Co.,* 287 U.S. 77, 82–83, 53 S.Ct. 42, 44, 77 L.Ed. 175 (1932) (citations omitted). While not taking issue with the majority's citation to the Court of Appeals' conclusion in *Smith v. Commonwealth,* Ky.App., 41 S.W.3d 458, 459–60 (2001), that its holding was in accord with an established rule of grammar, *Smith,* in fact, cited no authority for that proposition and I have found none in the limited time and resources available to me today, *e.g.,* William C. Paxson, *The New American Guide to Punctuation* (Signet 1996); William Strunk Jr. and E.B. White, *The Elements of Style* (3d ed. McMillan 1979); and the six-hour time limit imposed for the completion of this opinion.

Nevertheless, if the General Assembly had intended the qualifying clause to apply to the contingency of disqualification, then it must also have intended it to apply to the contingency of death, and that interpretation would be absurd. A campaign committee cannot be formed until after the

---

1. Similarly, the Secretary of State's opinion, expressed in its March 31, 2003 memorandum to Fletcher, that the "disqualification" occurred when the Oldham Circuit Court issued its March 26, 2003, Order, is a mere opinion subject to legal challenge as Heleringer has done in this case. The Secretary of State is charged only with certifying that "a vacancy exists for a reason specified in this subsection." KRS 121A.080(11). Thus, while the Secretary's finding that a vacancy exists by reason of disqualification is necessary to the operation of subsection 11, the added opinion as to "when" the disqualification occurred is mere surplusage. Therefore, unlike the majority, I attribute no significance to the Secretary's opinion in determining this question of law.

slate has complied with KRS 118.125 and KRS 118.127, *i.e.*, filed its candidacy papers. *See* KRS 121.170(1). While the candidacy papers must be filed no later than 4:00 p.m. on the last Tuesday in January preceding the applicable primary election, there is no deadline for forming a campaign committee. While it is possible, of course, that the death of a slate member could occur after the filing of the slate's candidacy papers, I cannot envision a scenario where the slate's campaign committee would be formed after the death of a slate member. Thus, there would be no reason for the General Assembly to condition the filling of a vacancy caused by death upon the death occurring after the formation of the slate's campaign committee. And if the General Assembly did not intend for the qualifying clause to apply to the death contingency, there is no reason to conclude that it meant for that clause to apply to the disqualification contingency. Certainly, our policy of liberal construction of statutes in favor of a candidate's qualifications, *Greene v. Slusher*, 300 Ky. 715, 190 S.W.2d 29, 32 (1945), alone precludes such a construction.

Thus, I conclude that (1) Bates was disqualified to hold the office of Lieutenant Governor when the Fletcher–Bates slate filed its candidacy papers on December 3, 2002; (2) the fact of his disqualification triggered the provisions of the "vacancy" statute, KRS 121A.080(11); and (3) Fletcher was entitled to fill the vacancy caused by the disqualification even though Bates's disqualification occurred prior to the formation of the slate's campaign committee.

Accordingly, I concur with the result reached in this case.

GRAVES, J., joins this opinion.